## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JEWEL E. BROWN, | : | CASE NO. 3:02CV1516(CFD) |
|    *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | |
| CENTRAL CONNECTICUT STATE | : | |
| UNIVERSITY, DR. RICHARD JUDD, | : | |
| RICHARD BACHOO and | : | |
| CAROLYN MAGNAN | : | |
|    *Defendants* | : | November 15, 2007 |

## DEFENDANTS' MEMORANDUM IN SUPPORT
## OF SUMMARY JUDGMENT

### INTRODUCTION

The plaintiff, Jewell Brown, sued defendant Central Connecticut State University (hereinafter "CCSU") and three individual defendants when he was not selected as a finalist for the position of Coordinator of Multicultural Affairs ("COA") and Director of Affirmative Action in 2002. Mr. Brown asserts various causes of action premised entirely upon a difference of opinion between himself and the Search Committee about how to interpret his resume. Although he was considered minimally qualified by the Search Committee, Brown was not selected as a finalist. The committee considered his experience to be primarily focused in the area of human rights enforcement. A central part of the COA position was preparing the annual affirmative action plan for CCSU. From the committee's perspective other candidates were better suited for the position.

The plaintiff's case is filled with argument, innuendo and speculation, but no evidence of discrimination, defamation, misrepresentation, interference with a contract, negligence or negligence infliction of emotional distress.

Plaintiff's claims fail for a variety of reasons, some procedural and others on substantive grounds. But the common thread throughout is a lack of any probative evidence upon which a reasonable jury could find for the plaintiff.

Initially, defendants Carolyn Magnan, Richard Bachoo and Dr. Richard Judd have raised the lack of personal jurisdiction because none of these parties were personally served with process. The evidence will show that the summons for them in their individual capacities were dropped off at CCSU with people who had no authority to accept service of process. Defendants raised this defense in their Amended Answer. (Doc # 45, Exhibit 24).

As to the plaintiff's claims against CCSU, there is no evidence showing any type of disparate treatment or pretext based upon Brown's race or gender (Count One -- Disparate Treatment Discrimination claim). CCSU will proffer a legitimate non-discriminatory reason for its hiring decision. Plaintiff cannot withstand summary judgment based upon his own opinion about his credentials. His opinions are not relevant evidence. Also, plaintiff must proffer evidence that he has exhausted all administrative remedies and filed a timely lawsuit after receiving a right to sue letter under Title VII.

Turning to the plaintiff's common law claims against CCSU, these actions are barred by sovereign immunity and the Eleventh Amendment. Any of the plaintiff's claims directly against the state for defamation, misrepresentation, negligence, intentional interference with a contract, or the negligent infliction of emotional distress fail because a

plaintiff must first obtain permission to sue from the Connecticut Claims Commissioner. Then if permission is granted, suit is only authorized in state court. In short, the State of Connecticut has never waived its immunity to suit in federal court.

As to the individual defendants, they are statutorily immune under Conn. Gen. Stat. § 4-165 from any suits premised upon negligent conduct. The sole remedy is to go through the Connecticut Claims Commissioner, which the plaintiff has not done. As to the alleged intentional acts, the plaintiff will not be able to offer sufficient admissible evidence upon which to prove a case.

Plaintiff's federal § 1983 claim for equal protection fails because there is no evidence showing the disparate treatment of similarly treated people upon which to infer race or gender discrimination.

## STATEMENT OF FACTS

The plaintiff, Jewel E. Brown, is a resident of the State of Connecticut. Prior to 1999, Brown served as one of two Deputy Directors of the Connecticut Commission on Human Rights and Opportunities ("CHRO"). Brown and the other Deputy Director were both dismissed from their positions in September 1999. (FACTS, ¶¶ 1-2).

Defendant Carol Magnan, serves as the Counsel to the President for Central Connecticut State University (hereinafter "CCSU"). In June of 2002 she held her current position and was also acting as the Interim Director of Affirmative Action. Richard Judd was the President of CCSU in 2002. Defendant Richard Bachoo, a black male, is the current Chief Administrative Officer for CCSU and held that same position in June 2002. (FACTS, ¶¶ 3-4).

In June 2002, CCSU sought to fill the position of Coordinator of Multicultural Affairs and Director of Affirmative Action (hereinafter "CMA Position")  The CMA position is not within the classified state civil service, but is subject to the CSU Personnel Policies for Management and Confidential Professional Personnel.  The CMA is responsible for all aspects of Affirmative Action, including the drafting and filing of the University's Affirmative Action Plan with the CHRO by June 30 of each year. Further, the position is also responsible for monitoring the majority of CCSU job searches, the investigation of internal complaints, and the development of student, faculty and staff diversity education.  The job description also sought a person with preferable experience in developing multicultural programs, diversity awareness and work in a higher education environment. (FACTS, ¶¶ 5-8)

Magnan, as the hiring manager for this particular position,  appointed a diverse search committee from within CCSU to review the application materials and recommend finalists for on campus interviews.   Magnan selected a committee that she believed had the administrative experience to read the job description and do a fair job of assessing applicants' qualifications in connection with the job posting.  Magnan met with the search committee members on or about May 15, 2002 and told them that her desire was to get someone who could perform all of the job duties, and in particular, could prepare the affirmative action plans for the University because that is a large portion of the job. She provided the committee with information about how to conduct a search and complete the Affirmative Action forms.   The Committee was responsible for evaluating the candidates and categorizing them as either not-qualified, minimally qualified and finalists who would receive an interview. (FACTS, ¶¶ 9-12).

The search committee was comprised of Bachoo (Chairperson) a black male; Elene Demos, a white female; Twan Do, an Asian male; Domingo Arias, a Hispanic male; and Olusegun Odesina, a black male. (FACTS, ¶ 13) Donna Munroe, the CCSU Chief Personnel Officer, served as the University's Affirmative Action representative for this particular search because Magnan was the hiring officer. Munroe met with the committee and reviewed the affirmative action policies that govern hiring searches. FACTS, ¶¶ 14).

The job announcement directed interested persons to send a letter of interest and resume to the Search Committee Chairperson, Bachoo. Sixty-two (62) people applied for the CMA position. The search committee was not provided with the racial makeup, gender or age of the candidates during the selection process. In June 2002, letters were sent out to various community organizations encouraging minority applicants to apply for the position. (FACTS, ¶¶ 15-16).

Plaintiff believes he sent in a resume after hearing about the job by word of mouth. The plaintiff sent his resume directly to the CCSU Personnel Office. His resume was forwarded to the committee with directions to consider it along with all of the other applicants. (FACTS, ¶¶ 17-18) During the review process, Bachoo informed Magnan that the committee was considering rejecting the plaintiff as not qualified because his resume listed no dates upon which the committee could determine his years of service in each position. Magnan asked Bachoo to give the plaintiff all due consideration. Magnan wanted the committee to consider the plaintiff for the position but did not want to interfere in their deliberations. (FACTS, ¶ 19)

The search committee Chairperson communicated to plaintiff that he needed to send a current resume with dates and a letter of interest. The plaintiff sent a letter of interest in the CMA position, but did not provide any dates on his resume. (FACTS, ¶ 20).

To get the evaluation process started among committee members, Bachoo designed a score sheet for search committee members to use for evaluating which candidates were minimally qualified for the position. The scoring sheet was only an informal starting point for the committee to begin discussions of each candidate. The search committee met and discussed every candidate. Those candidates that did not meet the minimum qualifications were excluded from further consideration. From the committee's perspective, forty-seven (47) candidates did not meet the minimal qualifications.   Fourteen (14) candidates, including the plaintiff, were considered minimally qualified by the search committee.  (FACTS, ¶ 21-23).

Having identified the qualified candidates, the committee reviewed and evaluated each of the candidates' credentials (resume and cover letter) to select six finalists who would receive on campus interviews.  The plaintiff was not selected as a finalist. The Committee did not select the plaintiff because, based upon his resume, the committee interpreted Brown's experience as being focused primarily upon enforcement and not on Affirmative Action plan preparation for state agencies. Brown's resume did not state how much of his time he spent drafting Affirmative Action plans or the number of plans.  Also, the plaintiff's resume listed no dates for the Committee to ascertain how long he had served in each position listed on his resume.   The six finalists included one male and five females.  Two candidates had a Ph.D.  Four had direct experience in higher

education or extensive experience with Affirmative Action programs. (FACTS, ¶¶ 24-26).

After the committee had discussed all the applicants and reached a consensus about the finalists to be interviewed, Bachoo prepared the Affirmative Action Form 3, listing all the candidates and the classifications. For the plaintiff, Bachoo noted his race because he had met him and knew he was African American. Bachoo did not share information about the plaintiff's race with the other search committee members. (FACTS, ¶ 27)

Before the Search Committee notified applicants of their status, Magnan met with Bachoo and discussed the committee's recommendations. Magnan, as the Hiring Manager, reviewed the resumes and compared them to the job description to see if she concurred with the committee's categorization of the candidates. Munroe, as the Affirmative Action person monitoring the search, also reviewed the lists of finalists. The committee ultimately recommended six candidates for on-campus interviews and then three finalists to Magnan for her to consider for a final hiring selection. (FACTS, ¶¶ 28-30)

Magnan reviewed the plaintiff's resume and concurred with the committee's recommendation that the plaintiff, although minimally qualified, not be interviewed for the CMA position. Magnan agreed that he had no experience in the preparation of affirmative action plans for state agencies since his experience was at the oversight level and not at the level of actual plan preparation. (FACTS, ¶ 31) On August 11, 2002, after the Search Committee had made its recommendations, the plaintiff sent a letter to Bachoo. In his letter the plaintiff indicated that he was aware that he had not been selected for an

interview and then proceeded to assert several arguments about why he disagreed with the search committee's interpretation of his resume. On August 19, 2002, Bachoo acknowledged receipt of the plaintiff's letter. He passed the letter and information on to the search committee for its feedback.  The Committee did not change its opinion.  The committee members concluded that it would be unfair to reconsider the plaintiff after the process was completed and other applicants were not given an opportunity to submit additional information. (FACTS, ¶¶ 32-33)

Thomasina Carr, a black female,  with over ten (10) years of Affirmative Action experience in state government, including drafting Affirmative Action plans, was ultimately recommended to the President of the university by Magnan. The university president made the actual decision to hire Ms. Carr and he issued the appointment letter. (FACTS, ¶ 34).

The search committee had no knowledge of the plaintiff's experience  or associations at the CHRO, except for what was listed on his resume. Magnan did not tell the committee to reject the plaintiff.  To the contrary, Magnan asked Bachoo to make sure that he receive full consideration. Magnan wanted the committee to consider him for the position but did not want to interfere in their deliberations.  (FACTS, ¶¶ 35-36)

The plaintiff admits he has no evidence to support his allegation that his relationship with the former controversial head of the CHRO, Louis Martin, was the reason that he was denied the CMA position.  The search committee had no knowledge about plaintiff's interactions while serving with the CHRO. They did not even know when and under what circumstances the plaintiff left the CHRO. Magnan made no negative comments about the plaintiff's affiliation with the CHRO. (FACTS, ¶¶ 37-38)

Plaintiff admits that he never prepared an Affirmative Action plan for a state university and that his resume did not list any work experience at a university. When the plaintiff was employed with the CHRO, that agency did not submit an Affirmative Action plan. Plaintiff did not provide dates for his work experience or the date he obtained his law degree. When Brown was employed by the CHRO, he spent about 50-75% of his time on enforcement of civil rights and then a female by the name of Lolita Jones became a deputy director who handled affirmative action matters.  Brown's resume does not state how much of his time he spent drafting Affirmative Action plans or the number of plans. (FACTS, ¶¶ 40-43) When asked to substantiate his allegation that defendants Magnan and Bachoo communicated negative information about Brown's prior experience at the CHRO to search committee members, he stated that he could not prove it at the time but would be able to do so later. Brown never disclosed any additional information to this point in response to defendants' discovery requests. Brown admits that he is not aware of ANY conversations defendant Magnan had with anyone about his [Brown's] tenure at the CHRO while his application for the CCSU job was pending.  (FACTS, ¶¶ 44-45)

Plaintiff agrees that the resume he submitted to CCSU focuses on the fact that his prior job at the CHRO involved the enforcement of anti-discrimination laws. Brown admits that if there is a group of qualified applicants, the search committee had to ultimately select the finalists. Being named as a finalist doesn't mean that you will be selected for the job. (FACTS, ¶¶ 46-47) Brown contents that he was blackballed from the CCSU position by Bachoo.  However, when asked what evidence he has to support this allegation, Brown testified that he met Bachoo one time at a CCSU reception, spoke to

him for several minutes and cannot recall the contents of the conversation. (FACTS, ¶¶ 48)

Brown was hired by the CHRO in 1991 by the then Executive Director, Louis Martin. During the period of 1988 to 1994, Thomasina Carr, the successful candidate for the CMA position, was also employed by the CHRO under Louis Martin as Human Rights and Opportunities Representative. (FACTS, ¶¶ 49-50) Bachoo was present for all meetings when the search committee met to discuss the applicants and the plaintiff's race, gender and age was not mentioned, discussed or considered by the search committee. (FACTS, ¶ 51).

Defendants Magnan, Richard Judd and Bachoo were never served with process in their individual capacities. Copies of the complaint and summons were dropped off at CCSU with persons who were not authorized to accept service for any individual defendant in their personal capacity. The Defendants attest that they never authorized any person to accept personal service on their behalf.    The defendants raised the issue of a lack of service of process upon Defendants Magnan,  Bachoo and Judd in their Amended Answer as an affirmative defense. (FACTS, ¶¶ 52-53).

## SUMMARY JUDGMENT STANDARD

"[S]ummary judgment allows the court to dispose of meritless claims before becoming entrenched in a frivolous and costly trial." Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d 54, 58 (2d Cir. 1987).  Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered when a review of the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

"In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995). Once that burden is met, the opposing party may not rely upon mere allegations or denials in his pleading, but rather must set forth specific facts showing that there is a genuine issue remaining for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997)("[e]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment"). ***"If the [plaintiff's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted."*** Anderson, 477 U.S. at 249-250 (citations omitted)(emphasis added).  As the Supreme Court has made clear, the Court must evaluate the defendant's motion for summary judgment according to the plaintiff's ultimate burden of proof. Anderson, 477 U.S. at 252; Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The fact that this case is an employment discrimination case does not alter the application of these rules. Although questions concerning the employer's intent may arise in such cases, the Second Circuit has emphasized that "the summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion. Indeed, the salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than to commercial or other areas of litigation." Meiri v. Dacon, 759 F.2d 989, 998 (2d. Cir.), cert. denied, 474 U.S. 829 (1985);  Johnson v. Tower Air, Inc., 149 F.R.D. 461, 466 (E.D.N.Y. 1993).

In the present case, the plaintiff's total lack of evidence to support the essential elements of his claims compels the conclusion that no reasonable jury could render a verdict in his favor. As the Second Circuit stated in another employment discrimination case, "**some** evidence is not sufficient to withstand a properly supported motion for summary judgment; a plaintiff opposing such a motion must produce sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not the employee's age [or national origin] was the real reason for the discharge." <u>Woroski v. Nashua Corporation</u>, 31 F.3d 105, 109-110 (2d Cir. 1994)(emphasis in original). In the absence of such evidence, summary judgment for the defendant is not only appropriate, but warranted in order to prevent the parties and this Court from "becoming entrenched in a frivolous and costly trial." <u>See</u> <u>Donahue v. Windsor Locks Board of Fire Commissioners</u>, 834 F.2d 54, 58 (2d Cir. 1987); <u>Raskin v. Wyatt</u>, 125 F.3d 55, 65 (2d Cir. 1997).

## <u>ARGUMENTS</u>

### THE COMPLAINT AGAINST THE INDIVIDUAL DEFENDANTS NAMED IN THEIR INDIVDIUAL CAPACITIES MUST BE DISMISSED FOR LACK OF SERVICE OF PROCESS.

Defendants Magnan, Bachoo and Judd contest personal jurisdiction under Rule 12(b)(5) for the lack of proper service of process. The summons and complaint were not properly served on them in their individual capacities. The federal rules provide that service upon an individual may be made by in-hand service, abode service, by request to waive, or pursuant to the law of the state in which the district is located. Fed. R. Civ. P. 4(e) and (f). In Connecticut, service may be made on an individual by in-hand or abode service. Conn. Gen. Stat. § 52-57(a). The return of service filed by the marshal in this case indicates that service was effectuated against defendants Magnan, Bachoo and Judd by leaving a copy of the summons and complaint with Wendy Wilton, Clare Coggshall

and Grace Kennedy, all Administrative Assistants employed by CCSU. (Exhibit 26). None of these people were authorized to accept service for any OF the individual defendants in their personal capacities. (FACTS, ¶ 52-53).

Service upon the agency is not sufficient service upon state employees or officers who are sued in their individual capacities. Bogle-Assegai v. CHRO, 470 F.3d 498 (2006); Burgos v. Department of Children & Families, et. Al. 83 F. Supp. 2d 313, 316 (D. Conn. 2000). In the present case, defendants Magnan and Bachoo executed affidavits stating *that no one was authorized to except service of process for them in their individual capacities.* (Exs. 4, ¶ & 16, ¶ 35). Wendy Wilton, the Administrative Assistant to President Judd, attests that *she had no authority to accept service of process for Richard Judd in his personal capacity*. (Ex. 23). Back in 2003, defendants put plaintiff Brown on notice of the deficiency in service through its Amended Answer where they raised lack of service of process as a defense. (Ex. 24, p. 12). Brown did nothing to effectuate correct service.

What the state marshal apparently did was show up at CCSU to deliver the complaint against the university and simply dropped off the remaining summonses with CCSU employees. However, leaving the complaints with Ms. Wilton, Ms. Coggshall and Ms. Kennedy did NOT effectuate service upon the individual defendants in their individual capacities.

As this court has noted, once service of process is challenged, it becomes the plaintiff's burden to show that service of process was adequate. Cole v. Aetna Life & Cas., 70 F. Supp. 2d 106, 109 (D. Conn. 1999). In the Bogle-Assegai case, plaintiff was placed on notice of  lack of personal jurisdiction through the defendants' answer. Some two years passed and the plaintiff did nothing to correct service. The court found her actions did not justify excusing service.[1] Following the same reasoning and law in this

---

[1]  Although representing himself pro se, plaintiff is an attorney who practiced law for years and who should be capable of locating the proper rule governing service of process.

case, the claims against defendants Magnan, Bachoo and Judd must be dismissed for lack of service.

### THE PLAINTIFF CANNOT PROVE A CLAIM UNDER TITLE VII.

Since disparate treatment is a form of intentional discrimination, plaintiff must prove that CCSU acted with discriminatory intent or motive. See Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 986, 108 S. Ct. 2777 (1988). Title VII disparate treatment claims are analyzed utilizing the three-step, burden shifting paradigm established by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817 (1973). See e.g., Chertkova v. Connecticut General Life Insurance Co., 92 F. 3d 81, 87 (2d Cir. 1996).

Under McDonnell Douglas, the plaintiff must initially establish a prima facie case, which gives rise to a presumption of discrimination. If plaintiff succeeds in establishing a prima facie case, the burden of production shifts to the defendant to articulate -- not prove -- a legitimate nondiscriminatory reason for its action. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S. Ct. 2097, 2106 (2000). If the defendant meets its burden of articulation, the inference of discrimination raised by the prima facie case then drops out and the plaintiff must prove by a preponderance of the evidence that the articulated reason(s) is merely a pretext for discrimination. In any case, it is the plaintiff who retains at all times the ultimate burden of persuasion on the critical issue of whether the employer was motivated, at least in part, by discriminatory intent. Id.

In a discrimination claim, the employer can offer any legitimate non-discriminatory reason for the actions it took.  In reviewing the employer's legitimate non-discriminatory reason, the court is not a "roving commission to review business

judgment." <u>Montana v. First Federal Savings & Loan Ass'n</u>, 869 F.2d 100, 106 (2d Cir. 1989) (internal citations omitted). "[F]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions." <u>Chapman v. AI Transp.</u>, 229 F.3d 1012, 1030 (11th Cir. 2000) (internal quotation marks omitted). Thus, the fact that a court may think that the employer made a mistake does not in itself expose it to Title VII liability. <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 259, 101 S. Ct. 1089; 67 L. Ed. 2d 207 (1981).

Some plaintiffs confuse this point and mistakenly believe that theY have met their burden of proof to show pretext by simply questioning the defendant's judgment. However, as the Seventh Circuit has pointed out, **"[T]he question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the [\*\*4] stated reason, but simply whether the stated reason was his reason: not a good reason, but the true reason."** <u>Forrester v. Rauland-Borg Corp.</u>, 453 F.3d 416, 418 (7th Cir. 2006).

The plaintiff must then show that this reason for the decision is a pretext for unlawful discrimination. "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his [her] business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and *the employee cannot succeed by simply quarreling with the wisdom of that reason*." <u>Chapman</u>, 229 F.3d at 1030 (emphasis added). "[A] reason cannot be proved to be a pretext *for discrimination* unless it is shown *both* that the reason was false *and* that discrimination

was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S. Ct. 2742;

125 L. Ed. 2d 407 (1993) (emphasis in original; internal quotation marks omitted).

### Plaintiff Cannot Establish A Prima Facie Case and CCSU Has Presented A Legitimate Non-Discriminatory Reason.

To establish a prima facie case under Title VII, the plaintiff must show that: (1)

he is a member of a protected class; (2) he was qualified for the position for which he

applied; (3) he was denied the job; and (4) the denial occurred under circumstances

giving rise to an inference of discrimination on a basis forbidden by Title VII.

McDonnell Douglas, 411 U.S. at 802; St. Mary's Honor Center v. Hicks, 509 U.S. 502,

113 S. Ct. 2742, 2747 (1993).

Assuming arguendo that the plaintiff succeeds in proving a prima facie case, the

burden then shifts to CCSU to proffer a legitimate, nondiscriminatory reason for

plaintiff's termination. Texas Dep't. of Community Affairs v. Burdine, 450 U.S. 248,

253, 101 S. Ct. 1089 (1981). At the summary judgment stage, "the fact that the

plaintiff has established a prima facie case does not in and of itself foreclose the

possibility of summary judgment being granted in favor of the employer." Young v.

General Foods Corp., 840 F. 2d 825, 828 (11th Cir. 1988). CCSU is not required to

prove the absence of a discriminatory motive to rebut a prima facie case. Rather, its

burden is one of production only, and virtually "[a]ny legitimate nondiscriminatory

reason [for the claimed adverse action] will rebut the presumption triggered by the

prima facie case." Fisher v. Vassar College, 114 F. 3d 1332, 1335-36 (2d Cir. 1997),

cert. denied, 522 U.S. 1075 (1998). An employer can meet the burden of proffering a

legitimate non-discriminatory justification by introducing "admissible evidence which

would allow the trier of fact rationally to conclude that the employment decision was not motivated by a discriminatory animus." Id.

In the present case, there is simply no evidence that the plaintiff's race, gender or age motivated the CCSU search committee's decision. The CCSU search committee did not select the plaintiff as a finalist because they considered his experience to be focused primarily towards civil rights enforcement (which the committee called compliance). The committee perceived a lack of experience drafting affirmative action plans. Brown's only argument with this reason is that committee members did not fully understand civil rights, otherwise they would have known that his experience included plan drafting. Despite the express language in the job posting which reads in part: ". . . six years of professional experience in an affirmative action or equal employment opportunity program *including experience in the preparation of affirmative action plans,*" Brown admits that his resume listed no dates and does not inform the committee about his experience, if any, drafting affirmative action plans for state agencies. (FACTS, ¶'s 39, 40, 41, 43). When specifically questioned about this point in his deposition, Brown concedes that his resume does not state how much time he spent drafting affirmative action plans or how many he had worked on. (FACTS, ¶ 43). If the search committee had any difficulty appreciating Brown's experience, the fault lies with him. He drafted his resume and made the task of evaluating his credentials more difficult by deliberately omitting dates, despite a request to the contrary. (FACTS, ¶ 20). Brown's resume emphasized his enforcement experience because in fact, he had little affirmative plan drafting experience. (FACTS, ¶ 46). In sum, the committee was free to rely on its good faith subjective evaluation of Brown's credentials. Byrnie v. Town of Cromwell, 243

17

F.3d 93, 104-105 (2d Cir 2001) (anti-discrimination law does not per se prohibit an employer from relying on honest, subjective opinions).

Of the six finalists selected, two had a Ph.D, three had experience in higher education. (Ex. 11). The successful candidate, Ms. Thomasina Carr, had 10 years of experience in Connecticut state government both enforcing civil right laws and preparing affirmative plans for state agencies. (Ex. 21). Whatever the committee's opinion of the six finalists they perceived to be the best fit for the position, there is no evidence that race or gender played part in the decisions.

More astounding is Brown's suggestion that the five member search committee, made up two black males, one Asian male, one Hispanic female and one white female, discriminated against him because of his gender or race. The successful candidate was a black female. Under federal law, the selection of a candidate from the same protected class as the plaintiff (race), diminishes an inference of discrimination based upon the same shared characteristic. There is "a well-recognized inference against discrimination exists where the person who participated in the allegedly adverse decision is also a member of the same protected class. . . . Although this does not end the inquiry, it provides an additional inference which plaintiff must overcome." Drummond v. IPC Int'l, Inc., 400 F. Supp. 2d 521, 532 (E.D.N.Y. 2005) (citations omitted). See also Toliver v. Community Action Comm'n to Help the Economy, Inc., Cache, 613 F. Supp. 1070, 1074 (S.D.N.Y. 1985) (stating that if decision maker is in same protected class as plaintiff, claims of discrimination become less plausible), aff'd, 800 F.2d 1128 (2d Cir. 1986); Poeta-Tisi v. Griffin Hosp., 2006 Conn. Super. LEXIS 1412, *15 (Conn. Super. May 17, 2006). Brown simply has no substantive evidence upon which a reasonable jury

could conclude that the real reason for the committee's decision declining to select him as a finalist was his inclusion in a protected class.

Brown also asserts that he was black balled by defendant CCSU because of his affiliation with a controversial former CHRO Executive Director, Louis Martin. Not only did the committee not know about Mr. Brown's affiliations while he was employed by the CHRO (FACTS, ¶ 38), but Brown's own admissions disprove this claim. The successful candidate, Thomasina Carr, also worked at the CHRO under Mr. Martin while Brown was employed there. (FACTS, ¶ 50). When questioned about his theory that defendant Bachoo and Magnan made negative comments about him, he could only come up with that he had previously met Bachoo for five minutes at a CCSU reception. (FACTS, ¶ 44). Plaintiff admits that:

(a)     He has no evidence supporting his allegation that his relationship with Louis Martin was the reason he was denied the COA position. (FACTS, ¶ 37).

(b)     He is not aware of any conversations by defendants Magnan or Bachoo with anyone about Brown's tenure at the CHRO while his application was pending. (FACTS, ¶ 45);

(c)     Has no evidence that Magnan or Bachoo communicated negative information about him [Brown] to the search committee. (FACTS, ¶ 44).[2]

---

[2]   Assuming arguendo that Brown was not selected because the committee did not like his affiliation with Louis Martin, that fact alone does prove a case of race or gender discrimination. The employer's decision can be unwise, unfair, imprudent or even stupid, but that is not discrimination. "The employer need not prove that the person promoted had superior objective qualifications, or that it made the wisest choice, but only that the reasons for the decision were nondiscriminatory". See Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 258-59, 67 L. Ed. 2d 207, 101 S. Ct. 1089 981); Lieberman v. Gant, 630 F.2d 60, 65 (2d Cir. 1980); Powell v. Syracuse University, 580 F.2d 1150, 1156-57 (2d Cir.), cert. denied, 439 U.S. 984, 99 S. Ct. 576, 58 L. Ed. 2d 656 (1978); Davis v. State University of New York, 802 F.2d 638, 641 (2d Cir. 1986).

In sum, there is a  dearth of any substantive evidence to support a claim of disparate treatment. Mr. Brown's personal opinions about the committee's lack of knowledge about civil right is not evidence of discrimination. Whatever shortcomings Brown attributes to the search committee, those shortcomings applied to all the candidates.

## ALL OF THE COMMON LAW CLAIMS AGAINST "CCSU" IN COUNTS TWO, THREE,  FOUR, FIVE AND SIX ARE BARRED BY THE ELEVETH AMENDMENT AND STATE SOVERIGN IMMUNITY

In Counts Two, Three, Four, Five and Six of the Amended and Substituted Complaint (Exhibit 1), the plaintiff alleges various common law causes of action for defamation, misrepresentation, intentional interference with a contract, negligence and the negligent infliction of emotional distress. All of these claims against CCSU are barred by the Eleventh Amendment and Sovereign Immunity.

There is no legislative authority for the proposition that the state has waived its Eleventh Amendment immunity to suits in federal court for the common law claims asserted in the instant case.  See, Gaynor v. Martin, 77 F.Supp.2d 272, 281 (D.Conn. 1999) (state law claims for breach of warranty and emotional distress dismissed for lack of jurisdiction).  Connecticut law has long recognized the common law doctrine that the state may not be sued without its consent.  Since the state can only act through its officers and agents, a suit against a state officer is effectively a suit against the state itself.  Horton v. Meskill, 172 Conn. 615, 623, 376 A.2d 359 (1977).

Absent legislative authority, the courts must decline to permit any monetary award against the state or its officials acting within the scope of their employment. There are three instances in which the state or its agents may be sued.  They are when: (1) the state has expressly waived sovereign immunity through legislation or by consenting to

20

suit; (2) an action merely seeks declaratory or injunctive relief based on a claim of constitutional violation; or (3) an action seeks declaratory or injunctive relief based on a claim that an official exceeded his statutory authority.  White v. Burns, 213 Conn. 307, 312, 567 A.2d 1195 (1990).  None of these exceptions apply in this case.

This principle is further supported by the common law precedent that the state is not liable under the doctrine of respondeat superior for the negligence of their officers, servants and agents in the performance of their governmental functions.  Bergner v. State, 144 Conn. 282, 285 (1937); Hewison v. New Haven, 37 Conn. 475, 483 (1871); Pope v. New Haven, 91 Conn. 79, 80, 99 A. 51(1916).  It is within this historical context that in 1959 the legislature enacted a statutory procedure for waiving the state immunity to suits for damages. The General Assembly established the Office of the Claims Commissioner, for the adjudication of claims against the state or for permission to sue the state.  See Conn. Gen. Stat. §§ 4-141, 4-158, 4-160.

Through this statutory enactment, a cause of action against the state for the negligent conduct of its employees is now exclusively recognized and controlled by Conn. Gen. Stat. § 4-160.   However, the state's waiver of its sovereign immunity does not provide for a direct legal action against the state.  Before suit may be filed, permission to sue the state must be obtained by a claimant using the statutory procedure outlined in Conn. Gen. Stat. § 4-147 through 4-158. Section 4-160 explicitly states:

> When the Claims Commissioner deems it just and equitable, he may authorize suit against the state on any claim which, in his opinion, presents an issue of law or fact under which the state, were it a private person, could be liable.

Conn. Gen. Stat. § 4-160.

Since in the present action the plaintiff does not allege facts demonstrating consent from the Claims Commissioner to bring an action against the state for the

intentional or negligent conduct of any state officials, these claims against defendant

CCSU must be dismissed.

### THE NEGLIGENCE CLAIMS AGAINST DEFENDANTS JUDD, BACHOO AND MAGNAN MUST BE DISMISSED BECAUSE THEY ENJOY STATUTORY IMMUNITY FROM PERSONAL LIABILITY.

An essential preliminary question in any suit against a state officer is whether the

officer is being sued in his individual or official capacity.  A suit against a state officer or

employee in his official capacity is simply a suit against the state itself.  Canning v.

Lensink, 221 Conn. 346, 349 (1992).  On the other hand, if a state officer is sued in his or

her individual capacity he or she may be protected by the statutory immunity set forth in

Conn. Gen. Stat. § 4-165.  See, e.g., Martin v. Brady, 261 Conn. 372 (2002).

A state employee is entitled to immunity from suit pursuant to Conn. Gen. Stat. §

4-165 which provides as follows:

> No state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his duties or within the scope of his employment.  Any person having a complaint for such damage or injury shall present it as a claim against the state under the provisions of this chapter.

*See also* Lemoine v. McCann, 40 Conn. App. 460, 463-65, 673 A.2d 115 (1996).

> "In order to establish that the defendants' conduct was wanton, reckless, willful, intentional and malicious, the plaintiff must prove, on the part of the defendants, the existence of a state of consciousness with reference to the consequences of one's acts....  [Such conduct] is more than negligence, more than gross negligence....  [I]n order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them....  It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action.... [In sum, such] conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent....  [Dubay v. Irish, 207 Conn. 518, 532-33, 542 A.2d 711 (1988) ]."  (Internal quotation marks omitted.)

Elliott v. Waterbury, 245 Conn. 385, 415, 715 A.2d 27 (1998).

Thus, Conn. Gen. Stat. § 4-165 immunizes state employees from suit as long as they were not acting outside the scope of their employment or in a wanton, reckless or malicious manner.  Martin v. Brady, 261 Conn. 372, 378 (2003).  More specifically, in order to overcome § 4-165 immunity, the record evidence must reasonably support a finding that the defendant's actions complained of were motivated by ***purely personal considerations entirely extraneous to his employer's interests*** and, therefore, not performed within the scope of his employment.  Id.  In other words, the defendant can only be deemed to have acted beyond the scope of his/her employment when their actions were "solely . . . to justify his own prior unjustified conduct, and not to carry out the governmental [duties] with which [he] was entrusted . . . . "  Martin v. Brady, 261 Conn. at 378 (quoting Shay v. Rossi, 253 Conn. 134, 174 (2000)).  Under Connecticut law, an employee is acting "in the discharge of his duties" if he is "reasonably fulfilling the duties of employment or doing something incidental to it."  Antinerella v. Rioux, 229 Conn. 479, 498 (1994).  Acting "within the scope of employment" means "while engaged in the service of the master."  Levitz v. Jewish Home for the Aged, Inc., 156 Conn. 193, 198 (1968).  Actions are within the scope of employment if they implicate "the affairs of the principal, and not solely the affairs of the agent."  A-G Foods, Inc. v. Pepperidge Farms,  Inc., 216 Conn. 200, 208 (1990).  If they are not designed to advance the employer's interest, but rather are motivated by purely personal considerations, they are not within the scope of one's employment.  Antinerella v. Rioux, 229 Conn. at 499.

In Martin v. Brady, 261 Conn. 372, 377 (2002), the Supreme Court held that state police officers who allegedly entered and searched the plaintiff's home without a search

warrant, damaged the plaintiff's property and physically assaulted the plaintiff while arresting him, were immune from suit under § 4-165 because such conduct fell within the scope of their employment.  In <u>Brady</u>, the Court instructed that "[i]n order to determine if a state actor's conduct is caused in the discharge of his or her duties or within the granted statutory authority, it is necessary to examine the nature of the alleged conduct and its relationship to the duties incidental to the employment."  <u>Id</u>. at 377.  The <u>Brady</u> court further stated:  "In the present case, the plaintiff has alleged that the defendants sought his arrest, executed a search warrant and conducted a search in an attempt to effectuate that arrest.  None of these actions were arguably outside the scope of their employment as state police officers.  The arrest of the plaintiff was sought for legitimate government interests namely, the extradition of a fugitive, the plaintiff . . . .  There was no allegation of a misuse of governmental authority for personal gain, as in <u>Antinerella</u>, nor was there any allegation of the extraneous manipulation of government authority in order to justify erroneous conduct, as this court found in <u>Shay</u>".  <u>Id</u>. at 379.

In the present case, there is no evidence that defendants Magnan, Bachoo or Judd took any action unrelated to their duties for CCSU.  Bachoo served on a search committee to recommend candidates for the COA position. Magnan was the CCSU hiring officer for the COA position and President Judd approved the final selection.  Statutory immunity is not eliminated by plaintiff's allegations of negligence. To the contrary, Brown's characterization of the conduct as "negligent" in Counts Five and Six places the causes of action squarely within the statutory protection.

**THE PLAINTIFF CANNOT PROVE A CONSTITUTIONAL CLAIM PREMISED ON A VIOLATION OF HIS RIGHT TO EQUAL PROTECTION**

Section 1983 does not create any new substantive rights, but merely provides a federal cause of action for the violation of certain federal rights. M. H. By, Through and With His Parents and Next Friends, Mr. And Mrs. H. v. Bristol Board of Education, 169 F. Supp. 21 (D. Conn. 2001); Mrs. W. v. Tirozzi, 832 F.2d 748, 754 (2d Cir. 1987). In order to prove a violation of his Fourteenth Amendment right to equal protection under the law, the plaintiff must prove the following elements: (1) he, as compared with other similarly situated individuals, was selectively treated; and (2) this selective treatment was motivated by an intention to discriminate based on impermissible considerations such as race or by a malicious or bad faith intent to injure the person. Muller v. Costello, 187 F.3d 298, 309 (2d Cir. 1999); Page v. Connecticut Department of Public Safety, 185 F. Supp.2d 149 (D. Conn. 2002). "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Village of Arlington Heights v. Metropolitan Housing Authority, 429 U.S. 256, 265, 97 S. Ct. 2040, 48 L. Ed. 2d 597 (1976); Patterson v. County of Oneida, 375 F.3d 206 (2d Cir. 2004); Annis v. County of Westchester, 136 F.3d 239, 245 (2d Cir. 1998), citing Sims v. Mulchay, 902 F.2d 524, 539 (7th Cir. 1990). As the Supreme Court has stated:

> The requirement of discriminatory intent or purpose "... implies that the decision maker, . . . Selected or reaffirmed a particular course of action at least in part 'because,' not merely 'in spite of' its adverse effects . . . upon a member of a protected group."

> Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 279, 99 S. Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). This Court, borrowing from Title VII cases, has held that the person or persons needs to be "similarly situated" in "all material respects."

*See* Clarke v. Sweeney, 2004 U.S. Dist. LEXIS 5028, * 64 (D. Conn. 2004); *see also*

Diggs v. Town of Manchester, 303 F. Supp. 2d 163, 178 & 183 (D. Conn. 2004)

(applying "all material respects" standard in Title VII discussion, and relying on that

analysis to deny equal protection claim as well);  Padilla v. Harris, 285 F. Supp. 2d 263,

271 (D. Conn. 2003) (same).

 Additionally, as part of his burden of proof to establish an equal protection

violation, the plaintiff must also prove that the **<u>defendants</u>** "caused" the deprivation of

his rights BECAUSE of his ***race or gender***. Taylor v.  Brentwood Union Free School

District, el al., 143 F.3d 679 (2d Cir 1998), citing Martinez v. California, 444 U.S. 277,

285, 100 S. Ct. 553, 62 L.Ed.2d 481(1980).

 In the present case, the plaintiff cannot show that defendants Bachoo, Judd or

Magnan intentionally violated his constitutional rights.  Bachoo was one of five people

on the search committee. Unless the plaintiff can show that Bachoo, himself a black male,

(1) exercised  control over the committee members to the extent that he overcame the will

of other members disposed favorably to the plaintiff, and (2) was motivated by plaintiff's

race or gender, there is no claim.  This would require some type of testimonial evidence

by committee members, which does not exist.

 Defendant Magnan testified that she requested of Chairperson Bachoo that the

committee give Brown "all due consideration." Mr. Bachoo confirmed this fact in his

testimony.  Ms. Magnan reviewed the committee's recommendations and she formed her

own opinion that Mr. Brown's experience was at the oversight level and not focused on

plan preparation. (FACTS, ¶ 31).  Plaintiff's disagreement with Ms. Magnan's

impression of his experience is not evidence of race or gender discrimination.

Accordingly, the plaintiff cannot create an inference of a violation of his equal rights.

### PLAINTIFF CANNOT PROVE A PRIMA FACIE CASE FOR THE TORT OF INTENTIONAL MISREPRESENTATION

In Count Three, the plaintiff alleges a cause of action for intentional misrepresentation. It is unclear to which defendants he is referring.[3] Assuming that plaintiff can overcome both the lack of personal jurisdiction over defendants Magnan, Judd and Bachoo, and the bar of sovereign immunity for claims against the state, his claim still fails for lack of proof.

For such a claim of intentional conduct, the plaintiff carries the heightened burden of showing fraudulent conduct. The elements of such an action include: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon the false representations to his injury. Billington v. Billington, 220 Conn. 212, 217, 595 A.2d 1377 (1991); Kilduff v. Adams, Inc., 219 Conn. 314, 329, 593 A.2d 478 (1991). The plaintiff must prove the first three elements by the higher standard of "clear and satisfactory" or "clear, precise and unequivocal." Rego v. Connecticut Ins. Placement Facility, 219 Conn. 339, 343, 593 A.2d 491 (1991).

As with all of his claims, there is no evidence of intentional misrepresentations by Magnan, Bachoo or Judd. The plaintiff takes his interpretation of events and distorts it into representations that did not actually occur. The job description for the COA position set forth all of the potential duties, including the preparation of affirmative action plans. To highlight this point the job posting set forth in a separate paragraph the requirement

---

[3] Notwithstanding the objection to personal jurisdiction and the bar of sovereign immunity, for the purpose of this brief defendant presumes that this count is addressed to all defendants.

for al least six years of experience with affirmative action programs "including the preparation of affirmative action plans." There was no misrepresentation. The employer is free to focus on whatever particular aspects of the job it desires. The facts that Brown had little experience in plan preparation according to his resume does not amount to misrepresentation. Whatever perceived misrepresentation the plaintiff contends was in the job announcement applied to ALL the applicants. The plaintiff was not prejudiced by any misrepresentation because **he failed** to outline his experiences in a manner that addressed the stated job duties.

Similarly, the plaintiff has absolutely no evidence that any of the individual defendants misrepresented his credentials to the search committee. The un-refuted evidence is that the plaintiff prepared and provided his resume and a cover letter to the committee. The committee based it decisions on its interpretation of the information provided by each applicant. As with his other claims, there was no actionable misrepresentation upon which a claim can be made. Mr. Brown's argument in hindsight that "had I known why my resume did not fit what you were looking for I would have done it differently" is not evidence of misrepresentation.

### THE PLAINTIFF'S DEFAMATION CLAIM FAILS TO STATE A CAUSE OF ACTION.

In the instant lawsuit, plaintiff also alleges that the defendants defamed him. Allegations in paragraphs 75 of his Amended and Substituted Complaint (Ex. 1) is confusing. In that paragraph he alleges that the defendants "accused plaintiff of not having supervised and oversaw the enforcement of State of Connecticut affirmative action statutory mandate during his employment with the state CHRO, defendants assertion amounted to an assertion that plaintiff received compensation under false

pretense because plaintiff was paid for overseeing all of the commission's enforcement responsibilities."  Notwithstanding the unintelligible nature of this allegation, plaintiff has no evidence that false statements of fact were published about him.

Under Connecticut law, defamation has two elements.  A plaintiff must prove that: (1) the **<u>defendant</u>** published false statements that harmed the plaintiff; and (2) the defendant was not privileged to do so.  <u>Kelley v. Bonney</u>, 221 Conn. 549, 563 (1989) (emphasis added); <u>Torosyan v. Boehr,</u> 234 Conn. 1, 41 (1995).  In addition, the statements published must convey an objective fact.  <u>Mr. Chow of New York v. Ste. Jour Azur SA</u>, 759 F.2d 219, 230 (2d Cir. 1985); <u>Daley v. Aetna Life & Cas. Co.</u>, 249 Conn. 766, 795-96 (1999).

To satisfy the first element in a defamation claim, Plaintiff must establish that Defendants "published the false statements that harmed [him]."  <u>Id</u>.  As a matter of law, Plaintiff's defamation claim cannot stand because he has failed to provide any documentary or testimonial evidence, beyond mere allegations, that Defendants were responsible for publishing any false statement of fact.  The committee's opinion or perception that Brown's work experience was mostly in "compliance and not plan development and administration" is not a defamatory statement. Defamation cannot be predicated upon a mere opinion. See <u>Mr. Chow of New York v. Ste. Jour Azur S.A.</u>, 759 F.2d 219, 230 (2d Cir. 1985) (no liability where restaurant review conveyed author's opinion rather than literal fact); <u>Hotchner v. Castillo-Puche</u>, 551 F.2d 910, 913 (2d Cir. 1977) (writer cannot be sued for simply expressing his opinion.)

In the present action, there were no defamatory statements of fact published about the plaintiff. His resume did not contain any dates. He admits this fact to be true. (FACTS,

¶ 41).  He further admits that the resume he submitted focuses on his prior job at the CHRO enforcing anti-discrimination laws. (FACTS, ¶ 46).  Nowhere did plaintiff's resume describe for the search committee his experience preparing affirmative action plans. (FACTS, ¶'s 39, 40, 42, 43). So the committee's opinion of Brown's credentials, even if taken as fact, was truthful.

Additionally, Brown's allegation that the defendants made defamatory statements about his affiliation with former CHRO Executive Director Martin is even more specious given his admission that he has no evidence to support such an assertion.  Brown is not aware of any conversations by the defendants disparaging his work at the CHRO. At best, all Brown has is speculation and suspicions because in his own mind he cannot fathom that someone could disagree with his own interpretation of his credentials. (FACTS, ¶'s 37, 44, 45).   In sum, a difference of opinion is not defamation.

### THE PLAINTIFF'S CLAIM FOR TORTIOUS INTERFERENCE WITH A BUSINESS EXPECTANCY AND/OR CONTRACTUAL RELATIONS FAILS AS A MATTER OF LAW

The plaintiff claims that the defendants interfered tortiously with his business expectancy and/or contractual relations.  The plaintiff's claim fails for several reasons. First he never had a contractual relationship or expectancy. He was never offered a position at CCSU or actually hired for a position. Second, under Connecticut law the employees of an entity cannot interfere with a contract or expectancy to which the employer is a party.

Connecticut courts have used the phrases tortious interference with contractual relations and tortious interference with a business expectancy interchangeably.  Harry A. Finman & Son, Inc. v. Connecticut Truck & Trailer Service Co., 169 Conn. 407, 415

(1975).  "[T]he elements of a claim for tortious interference with business expectancies are:  (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss."  Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 27 (2000).  "A cause of action for tortious interference with a business expectancy requires proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously."  Selby v. Pelletier, 1 Conn. App. 320, 324 (1984) (citations omitted; internal quotation marks omitted).  To prove malice, the plaintiff is required to prove "intentional interference without justification."  Daley v. Aetna Life & Cas. Co., 249 Conn. 766, 806 (1999).  "The essential thing is the intent to cause the result.  *If the actor does not have this intent, his conduct does not subject him to liability under this rule* even if it has the unintended effect of deterring the third person from dealing with the other."  Restatement (Second) of Torts, § 766, comment h (1979) (emphasis added).  See also Daley, 249 Conn. at 806 (Connecticut looks to Restatement § 766).  "The rule [also] applies . . . to an interference that is incidental to the actor's independent purpose and desire *but known to him to be a necessary consequence* of his action." § 766, comment j (emphasis added).

    The plaintiff cannot prove a case because he never had an employment contract with CCSU or an expectancy. Plaintiff alleges that he was not even selected as a finalist for the COA position that he sought.  So having no actual interview for the position, no job offer,  and no other indicia of a job expectancy, plaintiff cannot prove the first element of this tort.

Second, the alleged purveyors of this tort are all CCSU employees. In Connecticut, the employees of a corporation cannot tortiously interfere with a contract to which the company is a party. See <u>Wellington Systems, Inc. v. Redling Group, Inc</u>., 49 Conn. App. 152, 168, 714 A.2d 21, <u>cert denied</u>, 247 Conn. 905, 720 A.2d 516 (1998).  The principle behind this rule is that a corporate entity, acting through its employees, cannot interfere with its own contract. Certainly a party can breach a contract, for which the law provides a remedy.

The same reasoning applies to state agencies such as CCSU. If there was a contract to which CCSU was a party, its employees could not tortiously interfere with that contract. However, having already established that the plaintiff had legally recognized  contract or expectancy with CCSU, this claim is specious.

## <u>CONCLUSION</u>

For all of the reasons set forth in this memorandum, the defendants are entitled to summary judgment as a matter of law.

DEFENDANTS,

RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:    _____
        Joseph A. Jordano
        Assistant Attorney General
        55 Elm Street, P.O. Box 120
        Hartford, CT 06141-0120
        Tel: 860-808-5340
        Fax: 860-808-5383
        email: Joseph.Jordano@po.state.ct.us
        Federal Bar # ct21487

**<u>CERTIFICATION</u>**

The undersigned hereby certifies that on the  15th day of  November, 2007, a true

and accurate copy of the foregoing was sent by United States mail, first class postage

prepaid, to the following:

> Jewel E. Brown, Pro Se
> 21 Brewster Road
> South Windsor, CT  06074

                                        _____

                                        Joseph A. Jordano
                                        Assistant Attorney General